Dague v. Dumesic May it please the court. My name is Peter Angoulin. I'm here representing the appellants in this matter, the individual officers Hazen, Horn, and Dumesic, and the Las Vegas Metropolitan Police Department. We're before you today, Your Honor, Your Honors, because of the denial of qualified immunity on the part of the judge in Nevada on an unfortunate situation that occurred on April 7, 2004. On that date, officers were called to a scene to respond to an individual who claimed to be suicidal and who was threatening to end his life by suicide by cop. When they arrived, the officers took reasonable steps to try and gain control of the situation. They developed plans to eventually try and bring this individual into custody. They tried first by oral commands to obtain compliance. When that didn't work, the lieutenant on the scene had determined to try to use a taser to temporarily incapacitate or immobilize the gentleman and, therefore, assist him in being brought into custody. That ultimately did not work as they were trying to deploy this. How do you know it didn't work? Well, because as they were trying to deploy on the second plan, he saw them. He was on the phone at the time. They were walking behind him. He turned around, saw the officers, slammed the phone down, and then began to back away from the officers at that point. Did your clients have a reasonable belief that he was armed? They did, Your Honor. From the evidence in this case. Explain why. What's the evidence that would give them a reasonable belief that this person was armed? The officers have indicated that it was the way he was holding his hand inside his waistband. He was clearly holding onto something. His overall demeanor, his refusal to remove the hand and to show the officers his hands as they were giving him directions. And, again, the way that when he was walking backwards, the way he made the comment, I should say, he made the comment as they were approaching him with the first plan that was established by the lieutenant to tase him. When he slammed the phone down, he said to them, I have something here that's going to make you shoot me or want to shoot me. And the combination of all those, as the officers articulated, gave them reasonable belief that he had a weapon. You start off, though, and, again, we're construing the facts in the light most favorable to the plaintiff here. One, he tells the 911 operator he's not armed. Two, he says, but I think I can essentially fool the police into shooting me. And, three, you have the fact that they're trained not to taser anybody who's armed. Correct. So how do you, if you construe those facts in the light most favorable to the plaintiff, how do you reach the conclusion that they had an objectively reasonable belief that he was armed? That doesn't create a factual issue. Correct, Your Honor. The taser training is that if on a one-on-one issue I believe you have a firearm, I'm not to utilize my taser on you. Right. But in this case, we had more than one officer present. Where is that in the record, that if more than one officer, that you may taser someone who has a weapon? Well, I don't know that it's part of the taser policy that exists, I believe, Your Honor. But independent of that, at least on the evidence that was brought before the judge in this case, Appley's own expert agreed, having reviewed the record, that it was objectively reasonable for these officers to believe that he was armed and that they should have proceeded with the anticipation that he had a weapon. In fact, the judge indicated at the beginning of the motion hearing on this matter, he said that had, in fact, this gentleman pulled out the D-ring and pointed at the officers, even though it wasn't a weapon, that he believed it would have been reasonable for them to have shot him, that they could have reasonably believed that he had a weapon if he had made that move. Unfortunately, by the end of the argument, he did not still hold to that position. Because that's what the testimony, the unequivocal testimony is, that as the taser was deployed at the very end of this confrontation, when Officer Domesic attempted to deploy the taser in an attempt to, again, temporarily immobilize him, knowing that he had two officers who were... Right. But Domesic says in his deposition, your client, in your training with the taser, did it ever talk about whether to use or not use a taser against someone as a firearm? Answer, yeah, you will not use it on somebody with a firearm. So if that's true, he approaches this with the belief that this person doesn't have a firearm, otherwise he wouldn't have used the taser. That's his training. I disagree, Your Honor, and I apologize to the Court. I'll have to double-check the record. I believe his testimony is, though, that in this case, because he knew other people were going to be lethal, he was ordered, in fact, he originally was pulling out his firearm, and then his lieutenant ordered him to use his taser, to pull out the taser in an attempt to try and bring this gentleman in control. And he testified, and it's in the record, he testified that he then reholstered and then would use his taser because of what his lieutenant ordered him to do, not because he didn't think that the gentleman had a weapon, because that's what he was given orders to do. And so that's why he did what he did. But his consistent testimony is that he believed that he had a weapon. In fact, the only reason he utilized the taser at the very end was because he thought he was distracted and that maybe that would immobilize him so they could get hold of him. They were close enough to be able to converge on him. Unfortunately, it simply didn't work. As I indicated, the evidence in this case is that as they deployed the taser at the very end, at the point where Appley's own expert indicates they really needed to use the taser. In fact, he agrees that the use of the taser, even though he believes, agrees that the officers could objectively, reasonably believe that he had a firearm, he also agrees with the attempt to try to use the taser at the time that they did. He said that was in the record. Well, one of the reasons you don't use a taser on an armed person is that you can have an involuntary reaction to set off the firearm, right? I mean, that's the reason you, it's not a. Your Honor, I'm sorry. I didn't mean to cut you off. I apologize. No, that's all right. But respectfully, I would disagree. The reason you don't use a taser against someone with a firearm is tasers don't always work, as in this case. It didn't work, and so. If I recall from my other taser cases, at least that's what I've been asserted in those cases, that one of the reasons you don't do that is because you can have an involuntary reaction. If a guy's got his hand on the trigger, you're going to have an accidental discharge. You don't think so? No, Your Honor. In fact, I can only tell the court this. Yeah, go ahead. This isn't part of the record, but I can tell the court that in all the cases I've done involving tasers, that was never a consideration that I've ever heard. The reason you don't do this. We'll talk on the outside of the record, so I won't. I apologize. I'll use my knowledge, and then I'll talk about what you say. And, again, Your Honor, I'm just asking the question. I think it must be the cell phone today that's throwing me off, and I keep talking over you, and I apologize. That's okay. But, again, the primary reason you don't is because if I deploy the taser on you, and that's all I have, and it doesn't work, I'm in a very bad situation now. You never go to a knife fight with a feather in your hand. And officers are required to meet the level of force they think is out there or be above it. And so that's what these officers were trying to do. They had two officers who had their weapons out. One gentleman has a taser, and they're trying to talk this gentleman down. Ultimately, the testimony is that as they apply the taser, what the officers perceive is that it has no effect on him. There's an initial ouch, ouch, and he seems to tense up. And the consistent testimony of the officers is that he then relaxes while they still hear the taser operating, which is not the way somebody reacts who's been tased, and that he then draws his object out from under him, what he's been holding on his waistband, and points it at the officers. Officer Horn testified to that fact. Officer Hazen said he pointed directly at me. As the judge said, in that situation, those officers are absolutely justified in believing that this is an act of deadly force and that they can respond accordingly. And they did. They discharged their weapons. They did that, again, under circumstances where no one disagrees. In the evidence that was before the judge, no one disagreed that these officers didn't believe or shouldn't have believed that he was holding onto something and that that could very well have been a weapon. They did it under circumstances where he was apparently not under the influence of a taser at the time he does this. So it wasn't like he was tensing up. The description of the officers is very clear. He relaxes, and then he comes forward with this object, pointing it directly at the officers. And in response, they discharged their weapons. The law is clear that they're allowed to do that in those circumstances. You've got about a minute left. Do you want to reserve some for rebuttal? I will. Okay, thanks. Good morning. At Peace Accord, I'm Alan Lichtenstein, representing the Plaintiff Appellee. Before I start, I just want to make one correction that was pointed out in the reply brief. We had cited the Haugen case, and as the reply brief mentioned in Russo, it was actually reversed on other grounds. It was not reversed on the constitutional violation grounds, which is what we cited it for. But looking back, I realize that stating it was reversed on other grounds was not mentioned, so that was inadvertent, which I would apologize for. Did Roger Clark, your expert, that these officers had reason to believe that the victim was armed? He did say that there was some reason to believe that he was armed. He also said the officers had a concern that Daig was approaching this IHOP, correct? All right. Was that a legitimate concern on their part? Sure. Why would that be a legitimate concern? Well, if he's armed and there are people in the business, then you can't allow him to mingle in that state where you now have a hostage situation, so you deploy accordingly. So it seems that your expert admits that they had reason to believe he was armed. If that's true and his hand is under his garments like that, I mean, that's obviously what they're worried about. So when that hand comes out, you've got literally that much time to make a decision as to what you're faced with, don't you? Well, let me say two things. One, in terms of going to the IHOP, to say that there's a concern that he goes in there does not mean that he has to be tased because there were four officers. Could have, should have, would have, but if they had a reasonable belief that he was armed and he'd already told the 9-11 operator that he was going to fool them into believing somehow that they should kill him. Exactly what he said. It seems to me that the facts are undeniable. He was attempting to make the officers believe that he was armed. I don't believe so. Number one, what he said to the— Why was he holding a carabiner under his shirt then? He told you the carabiner even before the police arrived. That was his lucky carabiner. He had it under his shirt. He had been holding it. The police don't know that. The police, when the police arrived— Let me first respond to the question of what he said to the dispatcher. She said to him, do you have a weapon? No, I don't, but if I wanted to, I could make them shoot me. What was happening was when the police arrived, he was talking to the dispatcher, talking about where to get help, talking about—she was actually talking him down. He didn't confront the police. The police confronted him. Wasn't his intent to provoke the police into shooting him? It would seem unlikely since every time the police showed up, he ran away. When he first called and they sent the police, he hung up saying the police are here, I've got to get out of here. When he was talking to the dispatcher, she said, I don't want to talk to the police, I'm afraid of police. And she said, well, don't talk to the police then. Talk to the people in the ambulance. When he was confronted by the police, he didn't go forward. He started moving backward and they started following him. At no point did he make any aggressive move to the police unless you take the facts in the light that the defendants want and say that his motion in the three to five seconds while he was being tased was not an involuntary spasm. How are the law enforcement officers supposed to be able to calculate in that short time whether it's an involuntary reaction to a taser or a deliberate attempt to pull out what they had reason to believe was a weapon? Well, one of the questions was if they believed he was armed, why were they tasing him at all? It wasn't because he was threatening them. It was because he did not comply with the orders to put up your hands and get down on your knees. It was not because he had made any threat to them at that particular time. It was not even given as an order by the officer in command. It was a decision made by Officer Domezic totally on his own while he was there with taser in one hand, weapon in the other. How would you respond to an argument in court that this wasn't suicide by a police officer? That nothing that he did indicated that he wanted to confront the police all of his actions were to avoid the police, including walking up, backing away. That, yeah, would it have been more sensible for him to comply, get down on his knees and show his hands? Probably, but he was not in that mental state. But that doesn't mean that the fact that he avoided the police in every possible way he could can be negated. He did not confront the police. They clearly confronted him. What was he doing when they came, shone the light and started barking orders at him? He was on the phone with the dispatcher talking about getting help. And, again, the statement about the weapon, she asked him. He said, no, I don't have a weapon, but I could do that. And she said, well, how would you do this? I could get the police to shoot me if I wanted to. Clearly, he was contemplating suicide. Clearly, that might have even been contemplated if he was going to do it. But when the police got there, he was taking no action to try to commit suicide or to try to get them to shoot him. If he did, instead of backing away, he would have gone toward them. And he continued to back away, and they continued to follow him with their weapons drawn. And so how that could be construed as suicide by police in the three to five seconds while he was being tased, that the idea occurred to him, well, as long as I'm being tased, maybe I should just pull out the carabiner and they'll think it's a weapon and shoot me, is, well, let's say at best a disputed issue of fact that I think obviously is something that a jury would have to make a determination of. Hazen went there because he was dispatched by a dispatcher to do so. Is that right? My understanding was that they all just sort of caught the call, whoever was in the area. Well, a dispatcher put out a call. A dispatcher put out a call. Is there a tape recording of that call? Of the call to the officers? Yes. I don't believe I have seen one. Did you try to find one? The call is on the computer. It was something that came out on the computer. We did try. We could not obtain that to the best of my recollection. Because Hazen says that the dispatch they got was telling him that there was somebody who wanted to force us out to shoot him, force officers to shoot him. It was in the dispatch. There was a person who wanted to commit suicide. He was going to force officers to shoot him, suicide by cop. So is that the essence of the dispatch call? It would appear to be. However, if you look at the manual when these situations arise, number one, Hazen in particular, having the CIT training, was supposed to go there and try to de-escalate the situation. He didn't do that originally. He just pulled out his weapon and acted like one of the other officers. In addition, quite amazingly, nobody thought to call the dispatcher, which, again, is part of the manual, and say, what's going on with this guy? Let's remember, he was not acting violently. He was not threatening anybody when they arrived. He was talking on the telephone. This was not an exigent circumstance where they had to react quickly. This was one where, instead of dealing with him as somebody who was mentally ill and required CIT intervention, the first person on the scene was Dumezic, who shined his light and used his command voice, command presence, to say, put up your hands. Hazen says Mr. Dague slams the phone down and states, I have something here that's going to make you shoot me. And he continued to walk backwards. That's the testimony from all of them. That's what he said. Yes, but he didn't move toward them. He walked. He had his hand under his clothes. He had his hand under his clothes. They thought he had a weapon. Is that a reasonable belief on their part? I don't think it is. I think that, again, without some evidence of a weapon, and, again, the information was that he had said that he did not have a weapon. He told the dispatcher that. But he tells them he's got something that essentially he communicates that he has something that might be dangerous, whether it's a bomb or a gun or whatever. We don't know. But he says, I've got something under here. So he's trying to make them believe that he has something, right? Perhaps. I don't know. That is, again, a question of material fact in terms of what he meant. He certainly wasn't acting in a way that was trying to get them to shoot him because, again, he was trying to avoid them. That's undisputed. Your theory comes down to the fact that when they saw him draw or make the motion, they shouldn't have shot him. That's in the area where if somebody mistakes the object in the hand, qualified immunity ought to apply. If I may, the first officer who shot him was Officer Horn, and he said he shot him because Mr. Daig didn't act like some humongous guy he saw in some tape that somebody showed him sometime and he didn't fall down. Therefore, while he was still being tased, he was shot. Now, is that reasonable? I think a reasonable juror could say, no, that's not reasonable, because it was sort of shoot first and ask questions later, and it was not based on any knowledge or evidence concerning what tasing is all about and how someone might react, including the possibility of someone tensing up. It was just unload 25 shots into someone who, let's remember, never did anything other than simply call the 911 asking for a suicide hotline. That's all he ever did. And the idea that somehow or other this was his plan is belied by every fact that is, frankly, undisputed. What's up here is qualified immunity on the officers. I take it the Monell liability still goes to trial regardless of what happens here? Well, my understanding, I mean, obviously what happens here is determined by you gentlemen, but it would still be Monell liability, I would believe, because even if the question was, well, do the officers have a reasonable belief at that time, number one, you still can be liable for provoking the situation in the first place, even if the court were to determine that at the time of shooting, it may have been considered reasonable. That doesn't end the inquiry for the officers themselves and certainly doesn't end the inquiry for the Monell liability. Thank you. If I might respond to the last question, unless the court has a specific question, about Monell liability. I think that would be a factor of how this court enters its decision. Well, the Monell theory is that these officers were not trained, that there's a protocol for handling suicidal, mentally ill people. They didn't follow it. That's the essence, I gather, of the Clark expert testimony or deposition. That seems to me a separate theory from excessive force, perhaps. Is that the way you view it? It is not, Your Honor. Mr. Clark indicated the policies and the training regarding dealing with people like this were completely appropriate. There isn't anything in the record that indicates that Officer Hazen, who was a CIT, did not respond as he was required to. He tried to engage in verbal communications. He tried to talk the gentleman down. They followed. They had to obviously keep in contact with him. They stayed with him. But he kept giving him verbal communications. He repeats over and over again how he tried to establish the relationship, tried to get him to communicate with him. Right. But the Clark report goes on to detail all of these various ñ he criticizes what happened at the scene. He's talking about the failure to designate a single shooter, among other factors, that should have been handled differently when dealing with a suicidal or mentally ill person as opposed to a suspect. I mean, that's the essence, it seems to me, of the Clark opinion. You read it differently, I guess. My time has expired, Your Honor. You can keep talking when we're asking you questions. Okay. Well, thank you, Your Honor. I do read it differently. If this court comes back with a determination that there was not an actual violation here, that under clearly established law the actions of these officers were appropriate, then the entire case disappears. But procedurally, is the Monell issue before us or only the qualified immunity issue? Only the qualified immunity issue before you, Your Honor. So however we rule then, one way or another, you'll be back in the district court? We certainly would, but, again, depending on the structure of the court's opinion. It's okay. He still has his negligence and wrongful death theories. That's not touched at all by this. That's up to the district court or whether the district court wants to exercise supplemental jurisdiction. Correct. But, again, if this court were to issue the decision that, as the first part of the qualified immunity decision, there was not an actual constitutional violation here, the actions of the officers were clearly appropriate on the evidentiary record before the court, then those other cases would have followed their own accord. If the court holds for the second aspect. The mayor may not be right, but that's not before us. That's correct. The only thing that's in front of us is qualified immunity of the individual officers. It is, Your Honor. And since my time has expired, I appreciate your time. Thank you. Thank you. The case is heard and will be submitted.
judges: Trott, Thomas, Hogan